UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

| | |
|---|---|
| SEGURO MEDICO, LLC d/b/a QUICK HEALTH, | : |
|               Plaintiff, | : |
| | : |
| v. | :    No. 5:23-cv-2495 |
| | : |
| SUFFOLK ADMINISTRATIVE SERVICES, LLC, HAWAII MAINLAND ADMINISTRATORS, LLC, DATA MARKETING PARTNERSHIP, LP, PROVIDENCE HEALTH PLAN, PROVIDENCE HEALTH PARTNERS, PROVIDENCE HEALTH ASSURANCE, | : |
|              Defendants. | : |

_____

**O P I N I O N**
**Suffolk Administrative Services, LLC's Motion to Dismiss, ECF No. 25—Granted in part, Denied in part**
**Hawaii Mainland Administrators, LLC's Motion to Dismiss, ECF No. 26—Granted in part, Denied in part**
**Data Marketing Partnership, LP's Motion to Dismiss, ECF No. 31—Granted in part, Denied in part**

**Joseph F. Leeson, Jr.**                                                             **November 7, 2023**
**United States District Judge**

I.     INTRODUCTION

      Seguro Medico, LLC d/b/a Quick Health is a healthcare enrollment center which sells, amongst other products, Providence health care plans to the public. Providence plans are sponsored by Data Marketing, LP. To get from sale to enrollment and coverage, Quick Health sends its customer's payment data and enrollment forms to third parties who are then responsible for administering the Providence plans. In 2022, Quick Health began to field complaints from its

customers that the administration of these plans was breaking down, resulting in denials and lapses in coverage. In response, the third-party administrators, Suffolk Administrative Services, LLC, and Hawaii Mainland Administrators, LLC ("HMA"), began to blame Quick Health for the problems by claiming that Quick Health was scamming the customers and was actually the party responsible for the denials and lapses in coverage. Quick Health now asserts claims alleging promissory estoppel, commercial disparagement, and defamation. Defendants Suffolk, HMA, and Data Marketing have each filed a Motion to Dismiss the claims against them. Data Marketing has also filed a Motion to Dismiss for Lack of Jurisdiction. For the reasons set forth below, the Motions to Dismiss are granted in part and denied in part.

## II.     BACKGROUND

The factual allegations, taken from the Amended Complaint, *see* Am. Compl. ECF No. 15, are as follows:

Quick Health operates an enrollment center through which it sells health benefit products to the public. *Id.* ¶ 10. Among these products are Providence health plans. *Id.* Generally, Quick Health's business works as follows. Holding itself out to the public, Quick Health will describe available health care plans using the plan descriptions and summaries of benefits provided by plan administrators. *Id.* ¶ 15. A customer will decide to purchase an available plan, Providence's for example, through Quick Health. *Id.* ¶ 17. These are sales for which Quick Health earns a commission. *Id.* ¶ 19.

Upon the purchase of a Providence plan, Quick Health will collect the customer's credit card payment information and signatures on any enrollment documents. *Id.* ¶ 17. Then, Quick Health will send the enrollment documents and customer payments to a third-party administrator ("Payment TPA") which handles the plan premiums. *Id.* Payment TPA then sends the

premiums and enrollment documents to the third-party administrator for claims and the plan administrator. *Id.* ¶ 20. These are two separate entities. The first, Suffolk, provides administrative services for Providence plans. *Id.* ¶ 9. The second, HMA, is the third-party administrator who reviews claims arising under Providence plans and decides whether to approve or reject them. *Id.* ¶ 8. Both of these parties work for the third defendant, Data Marketing, which sponsors Providence health plans. *Id.* ¶ 3. This means that Data Marketing "ultimately pays for coverage and benefits in response to claims made under the Providence plans." *Id.* ¶ 3.

In 2022, this process began to breakdown as Quick Health began receiving complaints from its customers who were enrolled in Providence plans. *Id.* ¶ 24. These customers complained of, *inter alia*, excessive hold times on Defendants' customer service calls, lack of coverage on claims, surprise medical bills, and lengthy claims processing. *Id.* These customers complained to Quick Health even though Quick Health had no role in determining what claims should be covered. *Id.* ¶ 25. Notably, all parties to this action understood that Quick Health had no role in deciding claim coverage. *Id.* ¶ 38. While investigating these complaints, Quick Health learned that Payment TPA failed to forward customer premiums to Suffolk and/or HMA for 2,699 products affecting 1,729 distinct customers. *Id.* ¶ 30. As a result, Suffolk and HMA had no record of numerous customers. *Id.* ¶ 29.

At this point, the relationship between Quick Health, Payment TPA, Suffolk, and HMA declined even further. Quick Health insisted that Payment TPA, Suffolk, and HMA resolve the issue with customer premiums and honor the purchased plans. *Id.* ¶ 31. Not all plans were honored and several of those that were, were "slow walked" through the claims process. *Id.* ¶¶ 32, 34. HMA and/or Suffolk told their customers that Quick Health was responsible for

processing their claims and issuing any coverage denials, thereby redirecting customer complaints back to Quick Health. *Id.* ¶ 35. On multiple occasions, HMA and/or Suffolk representatives told customers that Quick Health "scammed" them by not forwarding their premiums. *Id.* ¶ 36.

To fix these misstatements, Quick Health, Suffolk, and HMA agreed to issue a corrective statement to the customers. *Id.* ¶ 39. Ultimately, that message was issued on January 29, 2023. *Id.* ¶ 40. However, by then, more than 6,200 customers cancelled the Providence products purchased through Quick Health, resulting in a $9.8 million loss in profits to Quick Health. *Id.* ¶ 41. Quick Health also avers that to induce Quick Health into selling Providence plans, Defendants purportedly promised to, amongst other things, offer customers referenced based pricing, advise customers of network negotiated rates, and provide the coverages described in the sales materials provided to Quick Health. *Id.* ¶ 44. Relying upon these representations, Quick Health invested in the infrastructure needed to sell the plans to its customers. *Id.* ¶ 45.

On May 23, 2023, Quick Health filed a Complaint in the Berks County Court of Common Pleas. On June 29, 2023, Suffolk removed this matter to federal court. *See* ECF No. 1. On August 14, 2023, Plaintiff filed an Amended Complaint. Count II of the Amended Complaint asserts promissory estoppel against all Defendants. Count III of the Amended Complaint asserts commercial disparagement against Suffolk and HMA. Count IV of the Amended Complaint asserts defamation against Suffolk and HMA.[1]

On August 28, 2023, both Suffolk and HMA filed a Motion to Dismiss, *see* ECF Nos. 25, 26, arguing that Quick Health has failed to state a claim on each Count of the Amended

---

[1] Count I of Quick Health's Amended Complaint asserted a cause of action arising under the Pennsylvania Unfair Trade Practices and Consumer Protection Act. While that count was withdrawn, it remains referenced as Count I of the Amended Complaint.

Complaint. On September 13, 2023, Data Marketing filed a Motion to Dismiss for Lack of Jurisdiction and for Failure to State a Claim, *see* ECF No. 31, arguing that this Court lacks personal jurisdiction over Data Marketing and that Quick Health has failed to state a claim with respect to Count II.

The matters are fully briefed. For the reasons that follow, Count II is dismissed without prejudice as to all Defendants, Data Marketing's Motion to Dismiss for lack of jurisdiction is denied without prejudice as moot, and HMA and Suffolk's motions to dismiss Counts III and IV are denied.

### III.   LEGAL STANDARDS

#### A.   Motion to Dismiss – Review of Applicable Law

Under Rule 12(b)(6), the court must "accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)) (internal quotation marks omitted). Only if "the '[f]actual allegations . . . raise a right to relief above the speculative level'" has the plaintiff stated a plausible claim. *Id.* at 234 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 540, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* (explaining that determining "whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense"). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint,

matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). Additionally, "a document integral to or explicitly relied upon in the complaint may be considered." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal quotations omitted). The defendant bears the burden of proving that a plaintiff has failed to state a claim upon which relief can be granted. *See Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

   **B. Promissory Estoppel – Review of Applicable Law**

Promissory estoppel, otherwise known as detrimental reliance, is an independent cause of action in Pennsylvania. *Fried v. Fisher*, 196 A. 39, 42-43 (Pa. 1938). It is an outgrowth of equitable estoppel through which one may "enforce a contract-like promise that would be otherwise unenforceable under contract law principles." *Peluso v. Kistner*, 970 A.2d 530, 532 (Pa. Commw. 2009). To maintain an action in promissory estoppel, a claimant must demonstrate:

> (1) the promisor made a promise that he should have reasonably expected would induce action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise.

*Id*. at 533. "A promise that could reasonably be expected to induce action or forbearance must be clear; a 'broad or vague implied promise' will not suffice.'" *Calderwood v. Rinsch*, No. CV 22-2847, 2022 WL 17251755, at *4 (E.D. Pa. Nov. 28, 2022) (quoting *Burton Imaging Grp. v. Toys "R" Us, Inc.*, 502 F. Supp. 2d 434, 439 (E.D. Pa. Aug. 8, 2007)). This is because it is unreasonable to rely upon a vague promise. *Id*. "These factors are strictly enforced to guard against the 'loose application' of promissory estoppel." *Peluso*, 970 A.2d at 533 (quoting *Fried*,

196 A. at 43). "The change in the plaintiff's position must be substantial, and there is 'no injustice in being deprived of a gratuitous benefit.'" *Id*. (quoting *Stelmack v. Glen Alden Coal Co.*, 14 A.2d 127, 130 (Pa. 1940)).

### C. Commercial Disparagement – Review of Applicable Law

Commercial disparagement, or trade libel, concerns the publication of a disparaging statement concerning a business where:

> (1) the statement is false; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does in fact result; and (4) the publisher either knows that the publication is false or acts in reckless disregard of its truth or falsity.

*Maverick Steel Co. v. Dick Corp.*, 54 A.3d 352, 354 (Pa. Super. 2012) (quoting *Pro Golf Manufacturing, Inc. v. Tribune Review Newspaper Company*, 809 A.2d 243, 246 (Pa. 2002)). "Unlike a defamation action, a plaintiff claiming commercial disparagement must prove actual pecuniary loss." *SNA, Inc. v. Array*, 51 F. Supp. 2d 554, 566 (E.D. Pa. June 9, 1999). This must be done with "considerable specificity" in that the plaintiff "must in his complaint set out the names of his lost customers and show by figures how much he has lost financially." *Swift Bros. v. Swift & Sons, Inc.*, 921 F. Supp. 267, 276 (E.D. Pa. Dec. 11, 1995) (quoting *Testing Systems, Inc. v. Magnaflux Corporation*, 251 F. Supp. 286, 290 (E.D. Pa. Mar. 2, 1966)).

However, "[t]his requirement is relaxed where the disparagement claimed rises to the level of defamation *per se*, through publication which 'imputes to another conduct, characteristics, or a condition that would adversely affect her in her lawful business or trade.'" *Am. Bd. of Internal Med. v. Von Muller*, No. 10-CV-2680, 2011 WL 857337, at *7 (E.D. Pa. Mar. 10, 2011) (quoting *Bro–Tech Corp. v. Thermax, Inc.*, 651 F. Supp. 2d 378, 416 (E.D. Pa. Sep. 3, 2009)). "Instead of proving pecuniary loss with specificity, a plaintiff 'need only prove general damages.'" *AC2T, Inc. v. Purrington*, No. CV 19-5946, 2021 WL 1853354, at *2 (E.D. Pa. May 10, 2021) (quoting

*Am. Bd. of Internal Med.*, 2011 WL 857337, at *7) (internal quotations omitted).  Direct pecuniary loss may also be demonstrated by "a general diminution in sales or specific lost sales."  *Brooks Power Sys., Inc. v. Ziff Commc'ns, Inc.*, No. CIV.A. 93-3954, 1994 WL 444725, at *3 (E.D. Pa. Aug. 17, 1994).

### D. Defamation – Review of Applicable Law

To state a claim for defamation under Pennsylvania law, a claimant must establish:

(1) The defamatory character of the communication.

(2) Its publication by the defendant.

(3) Its application to the plaintiff.

(4) The understanding by the recipient of its defamatory meaning.

(5) The understanding by the recipient of it as intended to be applied to the plaintiff.

(6) Special harm resulting to the plaintiff from its publication.

(7) Abuse of a conditionally privileged occasion.

42 Pa. C.S.A. § 8343(a).  "When relevant to the defense, the defendant has the burden of proving (1) the truth of the defamatory communication; (2) the privileged character of the occasion; and (3) the character of the subject matter of defamatory comment as of public concern."  *Momah v. Albert Einstein Med. Ctr.*, 978 F. Supp. 621, 634 (E.D. Pa. Oct. 7, 1997).  While analytically similar, defamation and commercial disparagement serve different purposes.  As the Third Circuit noted:

> The distinction between actions for defamation and disparagement turns on the harm towards which each is directed. An action for commercial disparagement is meant to compensate a vendor for pecuniary loss suffered because statements attacking the quality of his goods have reduced their marketability, while defamation is meant protect an entity's interest in character and reputation.

*U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 924 (3d Cir. 1990).

The Court's first step is determining whether the statement is capable of a defamatory meaning. *Tucker v. Philadelphia Daily News*, 848 A.2d 113, 123 (Pa. 2004). "To determine whether a statement is capable of defamatory meaning, the Court considers (1) whether the communication was reasonably capable of conveying the particular meaning ascribed to it by the plaintiff; and (2) whether that meaning is defamatory in character.'" *Monge v. Univ. of Pennsylvania*, No. CV 22-2942, 2023 WL 3692935, at *2 (E.D. Pa. May 26, 2023) (quoting *Pace v. Baker-White*, 432 F. Supp. 3d 495, 510 (E.D. Pa. Jan. 13, 2020)). A statement has defamatory meaning where it "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third parties from associating or dealing with him." *Tucker*, 848 A.2d at 124 (quoting *Birl v. Philadelphia Elec. Co.*, 167 A.2d 472, 475 (Pa. 1960)).

Relevant to that analysis, Pennsylvania law recognizes some statements as defamatory *per se*. These are statements concerning: "(1) a criminal offense; (2) a loathsome disease; (3) business misconduct; or (4) serious sexual misconduct." *Jungclaus v. Waverly Heights, Ltd.*, No. CV 17-4462, 2018 WL 1705961, at *3 (E.D. Pa. Apr. 9, 2018). "Typically, business misconduct refers to conduct that is illegal or connotes illegal activity." *Id.* at *4. While actions premised on a statement which is defamatory *per se* need not show element six, special damages, Plaintiff must still demonstrate general damages. *See Smith v. IMG Worldwide, Inc.*, 437 F. Supp. 2d 297, 307 (E.D. Pa. June 7, 2006).

## IV. ANALYSIS

### A. Promissory Estoppel

Quick Health's promissory estoppel claim generally avers that Defendants made several express or implied promises to induce Quick Health into offering Providence plans. Relying on those promises, Quick Health invested in the infrastructure needed to offer the plans to its customers. The specific promises at issue were that Defendants would:

      a. Properly handle and account for premiums collected from customers;

      b. Actually provide the coverages described in the sales materials provided to Quick Health for use in selling the Providence products to the public;

      c. Accurately and honestly convey to consumers the coverages available in the Providence plans that they purchased;

      d. Offer customers reference based pricing for health care services listed in the Providence plans;

      e. Advise customers of network negotiated rates available through the Providence network;

      f. Interact honestly with customers regarding the role of Quick Health as a customer enrollment center and not mischaracterize Quick Health as a claims adjuster or as having responsibility to pay claims; and

      g. Deal with Quick Health in good faith.

Am. Compl. ¶ 44.

      The Court finds that promises a, c, f, and g are too vague to induce reliance on the part of Quick Health. *See C & K Petroleum Prod., Inc. v. Equibank*, 839 F.2d 188, 192 (3d Cir. 1988) (holding that "[p]romissory estoppel would be rendered meaningless if" one could maintain a cause of action upon "a broad and vague implied promise" to "administer the main checking account . . . in the normal, banking fashion.")  Defendants' promise to interact honestly, properly, or in good faith is a broad canvas to which Quick Health may pin any number of specific complaints as they materialize later in their business dealings. *See Hoelzle v. Vensure Emp. Servs., Inc.*, No. 2:20-CV-00473-KSM, 2022 WL 507481, at *13 (E.D. Pa. Feb. 18, 2022) (holding that "Defendants' promises to 'make things right,' 'work together,' and 'help out in any

means' are far too vague to be the bases for a promissory estoppel claim"); *see also Burton Imaging* Grp., 502 F. Supp. 2d at 439 (holding that the statement "[w]e're going to move ahead with you as long as everything that you're doing passes the [test]" was too vague to support a claim of detrimental reliance where it "fail[ed] to indicate key terms" of a promise); *Calderwood*, 2022 WL 17251755, at *4 (collecting cases).²

That leaves the Court with promises b, d, and e. These promises at least reference more specific conduct, i.e., advising customers of network rates, offering referenced based pricing, and providing the coverage referenced in written materials. However, the Court finds the promises are still too vague to induce reliance because they are not definite enough to determine the existence of a broken promise. By way of example, consider Pennsylvania's seminal promissory estoppel case *Fried v. Fisher*. That case concerned a promise to release Fisher from the obligations of a lease. *Fried*, 196 A. 40-41. Specifically, Fried told Fisher "I release you," to "just forget about [the lease]," and that "[y]our responsibilities here are ended." *Id.* When Fried later tried to enforce the lease against Fisher, these promises formed the basis of promissory estoppel. *Id.* at 42-43.

There, the promise and its breach were readily discernable. The promises here, in contrast, are not so easily construed. Coverage, pricing, and rates are dependent on any number of factors as detailed in the Providence plans to which Quick Health is not a party nor a beneficiary. *See* Am. Compl. ¶ 26. Instead, the Court finds that these promises are generalized intentions of business dealings without any reference to specific enforceable terms. *See*

---

² Defendants make much of the distinction between implied and express promises. The Court less so. For one, Quick Health has pled that these promises were "express or implied." Am. Compl. ¶ 44. Second, in *Dansko Holdings*, the Third Circuit clarified that promissory estoppel could indeed be premised on a sufficiently narrow and specific implied promise. *Dansko Holdings, Inc. v. Benefit Tr. Co.*, 991 F.3d 494, 500 (3d Cir. 2021).

11

*Ankerstjerne v. Schlumberger Ltd.*, No. CIV.A.03-3607, 2004 WL 1068806, at *5 (E.D. Pa. May 12, 2004) ("The promise must be certain and explicit enough so that the full intention of the parties may be ascertained to a reasonable certainty.") Thus, they cannot form the basis of a claim sounding in promissory estoppel.

Further, these promises face an additional problem in that Quick Health is not the promisee to these promises. Rather, these promises actually regard representations made to Quick Health customers. Promise e represents that Defendants will advise *customers* of network negotiated rates, not Quick Health. Promise d represents that Defendants will offer *customers* reference based pricing. Lastly, promise b represents that Defendants will actually provide the coverage described *to the public*.

The Restatement, which has been adopted by the Pennsylvania Supreme Court, *see Thatcher's Drug Store of W. Goshen, Inc. v. Consol. Supermarkets, Inc.*, 636 A.2d 156, 160 (Pa. 1994), specifically references reliance by third parties. *See* Restatement (Second) of Contracts § 90 cmt. c. (1981). But the instant claim is far out of the mold it contemplated. That comment provides:

> If a promise is made to one party for the benefit of another, it is often foreseeable that the beneficiary will rely on the promise. Enforcement of the promise in such cases rests on the same basis and depends on the same factors as in cases of reliance by the promisee. Justifiable reliance by third persons who are not beneficiaries is less likely, but may sometimes reinforce the claim of the promisee or beneficiary.

*Id.* Quick Health does not receive the benefit of these promises, its customers do. Quick Health might receive some incidental benefit from Defendants providing coverage and/or offering customers reference based pricing and negotiated rates. But Quick Health offers no comparable application of promissory estoppel in Pennsylvania law. Its application here would recognize promissory estoppel as a vehicle by which vendors may bring claims on behalf of their

customers when their customers are dissatisfied with the customer service of a third party. This is an expansive view of promissory estoppel that runs counter to the caution that its factors be "strictly enforced to guard against the 'loose application' of promissory estoppel." *Peluso*, 970 A.2d at 533 (quoting *Fried*, 196 A. at 43).[3]

Accordingly, Plaintiff has failed to state a claim of promissory estoppel against any Defendant with respect to Count II. Count II is dismissed without prejudice[4] as to all Defendants.[5]

### B. Commercial Disparagement

Quick Health has sufficiently stated a claim for commercial disparagement. The statements forming the basis of the claim are: "[1] [that] Suffolk and/or HMA['s] represent[ations] to customers who had purchased Providence plans through Quick Health that Quick Health was responsible for coverage declinations, [2] that Quick Health was "scamming" the public, and [3] that Quick Health was the appropriate entity to contact for any remedy." Am. Compl. ¶ 48. These statements may be fairly read to, at once, pass the buck onto Quick Health

---

[3] Because the Court finds that Quick Health has failed to state a claim sounding in promissory estoppel, it need not reach Defendants' other arguments related to ERISA preemption.

[4] *See Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004) (holding that "even when a plaintiff does not seek leave to amend, if a complaint is vulnerable to 12(b)(6) dismissal, a District Court must permit a curative amendment, unless an amendment would be inequitable or futile")

[5] Count II is the only claim brought against Data Marketing who has also asserted lack of personal jurisdiction. Because the Court finds that Quick Health has failed to state a claim of promissory estoppel, it need not rule on Data Marketing's Motion for Lack of Personal Jurisdiction. Without offering any opinion as to the merits of the argument that the Court lacks personal jurisdiction, this Court advises Quick Health that if it files an amended complaint against Data Marketing for promissory estoppel it should include additional allegations, if any, regarding personal jurisdiction.

for faults in coverage and suggest that Quick Health "scammed" the public by taking customer money while failing to provide promised services.

The Court finds that the Amended Complaint establishes both the falsity of these statements and Suffolk and HMA's awareness thereof. According to the pleadings, the statements are false as the coverage decisions and plan administration were never in Quick Health's remit. They were instead in Suffolk and HMA's remit who thus had knowledge that any statements to the contrary were false. The second element is sufficiently pled because Suffolk and HMA either intended to cause pecuniary harm or should have reasonably recognized that it would have resulted as the natural consequence of their statements to Quick Health customers. Suffolk and HMA stated that Quick Health had "scammed" the public, which one would reasonably take to mean a dishonest or fraudulent scheme. It follows then that Suffolk and HMA should have reasonably known that the customers would then cancel their supposed fraudulent coverage (they did), causing pecuniary harm to Quick Health in the form of lost profit. *See* Restatement (Second) of Torts § 623A cmt. b. (1977) ("The publisher must, however, know enough of the circumstances so that he should as a reasonable man recognize the likelihood that some third person will act in reliance upon his statement.")

Finally, Quick Health has also sufficiently pled pecuniary loss. Specifically, it has pled that 6,200 customers cancelled their Providence plans because of the statements, resulting in a loss of $9.8m in profit for the sale of those plans. *See Brooks Power Sys., Inc.*, 1994 WL 444725, at *3 (noting that a plaintiff "may prove pecuniary loss through a general diminution in sales of the product actually caused by its disparagement.") This is sufficiently specific to plead pecuniary loss. *Cf. Mallory v. S & S Publishers*, 168 F. Supp. 3d 760, 775 (E.D. Pa. Mar. 10, 2016) (holding that mere threadbare allegations of "financial loss and lost opportunity" were

conclusory and insufficient to state a cause of action sounding in commercial disparagement.); *Brunson Commc'ns, Inc. v. Arbitron, Inc*., 266 F. Supp. 2d 377, 381-83 (E.D. Pa. June 10, 2003) (dismissing commercial disparagement claim where the plaintiff failed to "plead any specific amount or type of damages actually caused by this alleged disparagement.")

Accordingly, Suffolk and HMA's motion to dismiss Count III is denied.

### C.     Defamation

With regard to Quick Health's defamation claim, HMA and Suffolk argue that: 1) the pleadings fail to place Suffolk and HMA on notice of actionable defamation; 2) the statements are not capable of defamatory meaning; 3) Quick Health has failed to show that it suffered special harm; and 4) Quick Health has failed to establish actual malice.

The Court starts with the sufficiency of the pleadings. "A federal court sitting in diversity must apply state substantive law and federal procedural law." *Chamberlain v. Giampapa*, 210 F.3d 154, 158 (3d Cir. 2000). Under Rule 8(a) of the Federal Rules of Civil Procedure, Quick Health need only set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[U]nlike under the Pennsylvania pleading standard, the plaintiff need not identify the specific allegedly defamatory statement. 'As long as a defamation count provides sufficient notice to defendants, it states a claim.'" *Monge*, 2023 WL 3594471, at *2 (quoting *Rishell v. RR Donnelley & Sons Co*., No. CIV.A. 06-4782, 2007 WL 1545622, at * 3 (E.D. Pa. May 24, 2007) (footnote omitted).

The Court finds that Quick Health has met this threshold. As set forth above, Quick Health has identified the speaker (Suffolk and/or HMA), the approximate date (the third quarter of 2022 and first quarter of 2023), the defamatory statement (blaming Quick Health for denials and lapses in coverage and asserting that the company was scamming the public), and the

recipients (Quick Health customers who purchased Providence products). *See Lee v. Univ. of Pennsylvania, Sch. of Dental Med.*, No. CV 19-835, 2019 WL 4060843, at *6 (E.D. Pa. Aug. 27, 2019) ("To survive dismissal, Plaintiff must allege at least some specific statements identifying the speaker, the approximate date, the content, and the audience.")

The Court also finds that the statements are capable of a defamatory meaning as they impute criminal business misconduct. In its Amended Complaint, Quick Health alleges that Suffolk and/or HMA represented, or published, to customers that Quick Health was scamming the public, responsible for coverage declinations, and the appropriate entity to contact to remedy faults in coverage or other related issues. Taken together, the reasonable inference from these statements is that Quick Health is perpetrating criminal fraud by taking the customers' money and refusing to make good on its coverage. *See Tucker*, 848 A.2d at 124 (reasoning that in determining whether a statement is capable of defamatory meaning, the Court should view the statement in its context)  Even stripped of that context, a reasonable person would take "scamming" to mean a fraudulent or deceptive operation. *See Johnson v. Res. for Hum. Dev., Inc.*, 860 F. Supp. 218, 221 (E.D. Pa. Aug. 1, 1994) ("Corporations may claim defamation for language which imputes incompetence, dishonesty or lack of integrity in business conduct.")

While statements which are defamatory *per se* need not show special damages, Quick Health must still demonstrate general damages, or, "proof that one's reputation was actually affected by the slander or that one suffered personal humiliation." *Synygy*, 51 F. Supp. 2d at 581. Quick Health has done so. Here, as a result of the statements, customers have called into doubt "Quick Health's fitness for the conduct of its business," Quick Health has incurred expenses in responding to the statements, and the resulting policy cancellations have cost Quick Health $9.8 million dollars in lost profits. Am. Compl. ¶ 61.

Finally, Quick Health has sufficiently pled actual malice. In the context of defamation, a claimant seeking punitive damages must establish that the publisher acted maliciously, that is, with knowledge of the statement's falsity or reckless disregard for its truth. *See McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 359 (3d Cir. 2020); *see also Johnson*, 860 F. Supp. at 521. In the Court's analysis of the commercial disparagement claim *supra*, the Court noted that Suffolk and/or HMA knew their statements were false because they were the parties in charge of administering the health plans and reviewing claims. For the same reason, the Court finds that Quick Health has sufficiently established actual malice.

Accordingly, the Court denies HMA and Suffolk's motion to dismiss Count IV.

### D.     **Punitive Damages**

HMA seeks to dismiss Quick Health's claim for punitive damages. Under Pennsylvania law, "[p]unitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Feld v. Merriam*, 485 A.2d 742, 747 (Pa. 1984) (quoting *Chambers v. Montgomery*, 192 A.2d 355, 358 (Pa. 1963)). This is a necessarily fact specific inquiry as "the question of whether punitive damages are proper often turns on the defendants' state of mind [and] this question frequently cannot be resolved on the pleadings alone, but must await the development of a full factual record at trial." *De Oca v. Beato*, No. 3:17-CV-837, 2018 WL 3371919, at *5 (M.D. Pa. May 31, 2018), *report and recommendation adopted*, No. 3:17-CV-837, 2018 WL 3370559 (M.D. Pa. July 10, 2018). Since the Court finds that Quick Health has plausibly alleged actual malice in its commercial disparagement and defamation claims, it declines to dismiss the claim for punitive damage at this stage of the litigation.

## V. CONCLUSION

The Court grants Defendants' motions to dismiss Count II because Quick Health has failed to plead a sufficiently specific promise which reasonably induced its reliance. The Court overrules HMA and Suffolk's motions to dismiss Counts III and IV because Quick Health has sufficiently pled claims sounding in commercial disparagement and defamation. Since the sole claim against Data Marketing has been dismissed, Data Marketing's Motion to Dismiss for lack of personal jurisdiction is denied without prejudice as moot.

A separate order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge