UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

SEGURO MEDICO, LLC d/b/a QUICK      :
HEALTH,                             :
               Plaintiff,           :
                                    :
           v.                   :      No. 5:23-cv-2495
                                    :
SUFFOLK ADMINISTRATIVE             :
SERVICES, LLC, HAWAII MAINLAND     :
ADMINISTRATORS, LLC, DATA          :
MARKETING PARTNERSHIP, LP,         :
PROVIDENCE HEALTH PLAN,            :
PROVIDENCE HEALTH PARTNERS,        :
PROVIDENCE HEALTH ASSURANCE,       :
               Defendants.          :

_____

**O P I N I O N**
**Suffolk Administrative Services, LLC's Motion to Dismiss, ECF No. 43—Granted in part, Denied in part**
**Data Marketing Partnership, LP's Motion to Dismiss, ECF No. 44—Granted in part, Denied in part**

**Joseph F. Leeson, Jr.**                                **April 15, 2024**
**United States District Judge**

## I.     INTRODUCTION

      The parties to this litigation undertook to bring group health plans to market. The instant litigation arises out of a breakdown in the administration of those plans. In the wake of that breakdown, Defendants directed the blame back at Quick Health. Now, Quick Health brings suit to recover on that wrongfully placed blame and to recoup the loss it incurred from relying on Defendants' representations.

## II.     BACKGROUND

### A.     Factual Background

The factual allegations, taken from the Second Amended Complaint ("SAC"), *see* Am. Compl. ECF No. 40, are as follows:

Quick Health operates a healthcare enrollment center through which it sells health care plans to the public.  *Id.* ¶ 6.  Among these plans are Providence Plans which are sponsored by Data Marketing Partnership ("DMP") and administered by Hawaii Mainland Administrators, LLC ("HMA") and Suffolk Administrative Services, LLC.  *Id*. ¶¶ 3-6.  When the administration of those products faltered, Defendants pointed the finger back at Quick Health.  Now, Quick Health brings suit "to protect the public, to stop Defendants' misconduct, and to recoup losses caused by Defendants' wrongful actions."  *Id*. ¶ 2.

First, however, the Court finds that some background on DMP offers useful context to the underlying dispute and the applicability of ERISA preemption as analyzed later.  DMP offers health care plans to the public using a unique business model.  *Id*. ¶ 14.  DMP will execute a joinder agreement between itself and an individual member of the public, rendering the individual a "limited partner" of DMP.  *Id*. ¶¶ 14-15.  The arrangement requires the limited partner to install DMP's software onto their cell phone which tracks data.  *Id*. ¶ 16.  That data is then aggregated and sold to marketing firms.  *Id*.  In exchange, DMP will sell group health insurance plans, such as Providence, to the limited partners.  *Id*. ¶ 17.  These limited partners do not receive an equity stake in DMP and any income distributions are reported as guaranteed payments which are subject to employment taxes.  *Id*. ¶¶ 18, 19.

Quick Health, acting as an enrollment center, will sell and then facilitate the limited partner's purchase of a Providence Plan by "collect[ing] enrollment data from the customer as

well as payment information via an online portal that transfers the premium funds directly to a third-party administrator ("Payment TPA") who handles the premium payments." *Id*. ¶ 22.  For its part, Quick Health earns a commission on these transactions.  *Id*. ¶ 23.

From the Payment TPA, the customer enrollment data and premium payments are sent to two different third parties who administer the Providence Plans.  *Id*. ¶ 25.  The first is HMA who is the claims administrator.  *Id*. ¶ 28.  This means that HMA is in charge of deciding whether claims are covered under the relevant Providence Plans.  *Id*.  The second is Suffolk who is the plan administrator.  *Id*. ¶ 5.  Suffolk and HMA also provide descriptions and benefit summaries to help Quick Health sell the plans.  *Id*. ¶ 11.

In 2022, the process began to break down.  *Id*. ¶ 30.  Then, Quick Health began fielding calls from its customers complaining of, *inter alia*, excessive hold times on Defendants' customer service calls, lack of coverage on claims, surprise medical bills, and lengthy claims processing.  *Id*.  In several instances, HMA pushed the blame back on Quick Health.  *Id*. ¶ 32.  In one such instance, HMA told a customer that it could not honor the claim because Quick Health had not paid the member's premium when in reality Quick Health had.  *Id*.  Other statements took on a harsher tone.  Specifically, "HMA was informing customers that Quick Health was a scam, filed bankruptcy every two years, sold junk plans and were taking customer's money and not giving them a plan." *Id*. ¶ 30.  In response, Quick Health undertook to investigate these complaints.  *Id*. ¶ 33.  During that investigation, Quick Health found that the Payment TPA failed to forward the premium payments for some 2,699 products, affecting 1,729 unique customers.  *Id*. ¶ 35.  Suffolk and HMA did not fix these failures and continued to untruthfully claim that Quick Health was responsible for the denial of claims.  *Id*. ¶ 38.

In an effort to remedy Suffolk and HMA's statements, "Quick Health, Suffolk and/or HMA agreed to issue a corrective statement to the affected customers."  *Id.* ¶ 40.  That statement was ultimately issued on January 29, 2023.  *Id.* ¶ 41.  However, by then, more than 6,200 customers cancelled their Providence Plans purchased through Quick Health, costing it around $9.8 million in profits.  *Id.* ¶ 42.

### B.    Procedural Background

This matter was removed from state court by Suffolk on June 29, 2023.  *See* ECF No. 1.  On August 14, 2023, Quick Health filed an Amended Complaint.  *See* ECF No. 15.  On August 28, 2023, both Suffolk and HMA filed a Motion to Dismiss.  *See* ECF Nos. 25-26.  In an Opinion and Order entered November 7, 2023, the same was granted in part and denied in part.[1]  *See* ECF Nos. 38-39.  Quick Health was granted leave to amend the complaint as to any claims dismissed without prejudice.  *See* ECF No. 39.

On November 27, 2023, Quick Health filed the instant Second Amended Complaint asserting the claims that follow.  *See* ECF No. 40.  In Count I, Quick Health asserts breach of implied contract against all Defendants.  In Count II, in the alternative, Quick Health asserts detrimental reliance/promissory estoppel against all Defendants.  In Count III, Quick Health asserts commercial disparagement against Suffolk and HMA.  In Count IV, Quick Health asserts defamation against Suffolk and HMA.

On December 11, 2023, Suffolk filed the instant Motion to Dismiss which is joined by HMA.  *See* ECF Nos. 43, 45.  On the same date, DMP filed the instant Motion Dismiss for lack

---

[1]    Defendant DMP also filed a Motion to Dismiss for Lack of Jurisdiction and for Failure to State a Claim.  *See* ECF No. 31.  Because the Court granted HMA and Suffolk's 12(b)(6) motions as to the claims brought against DMP, the Court deferred ruling on DMP's 12(b)(2) motion.

of jurisdiction and for failure to state a claim.  *See* ECF No. 44.  These matters are now fully briefed and ready for disposition.  For the reasons that follow, the motions are granted in part and denied in part.

## III.     LEGAL STANDARDS

### A.        Motion to Dismiss – Review of Applicable Law

Under Rule 12(b)(6), the court must "accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff."  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)) (internal quotation marks omitted).  Only if "the '[f]actual allegations . . . raise a right to relief above the speculative level'" has the plaintiff stated a plausible claim.  *Id.* at 234 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 540, 555 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Id.*  (explaining that determining "whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense").  "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."  *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).  Additionally, "a document integral to or explicitly relied upon in the complaint may be considered."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal quotations omitted).  The defendant bears the burden of proving that a plaintiff has

failed to state a claim upon which relief can be granted. *See Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

### B.      Breach of Implied Contract – Review of Applicable Law

"As a general matter, in Pennsylvania, '[a] contract implied in fact is an actual contract which arises where the parties agree upon the obligations to be incurred, but their intention, instead of being expressed in words, is inferred from acts in the light of the surrounding circumstances.'" *Hickey v. Univ. of Pittsburgh*, 81 F.4th 301, 310 (3d Cir. 2023) (quoting *Elias v. Elias*, 237 A.2d 215, 217 (Pa. 1968)). "The essential elements of breach of implied contract are the same as an express contract, except the contract is implied through the parties' conduct, rather than expressly written." *Enslin v. The Coca-Cola Co.*, 136 F. Supp. 3d 654, 675 (E.D. Pa. 2015). Thus, a claimant must establish: "1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *Id.* at 674 (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super.1999)).

### C.      Promissory Estoppel – Review of Applicable Law

Promissory estoppel, otherwise known as detrimental reliance, is an independent cause of action in Pennsylvania. *Fried v. Fisher*, 196 A. 39, 42-43 (Pa. 1938). It is an outgrowth of equitable estoppel through which one may "enforce a contract-like promise that would be otherwise unenforceable under contract law principles." *Peluso v. Kistner*, 970 A.2d 530, 532 (Pa. Commw. 2009). To maintain an action in promissory estoppel, a claimant must demonstrate:

> (1) the promisor made a promise that would have reasonably be expected to induce action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise.

*Id*. at 533.  "A promise that could reasonably be expected to induce action or forbearance must be clear; a 'broad or vague implied promise' will not suffice.'"  *Calderwood v. Rinsch*, No. CV 22-2847, 2022 WL 17251755, at *4 (E.D. Pa. Nov. 28, 2022) (quoting *Burton Imaging Grp. v. Toys "R" Us, Inc*., 502 F. Supp. 2d 434, 439 (E.D. Pa. Aug. 8, 2007)).  This is because it is unreasonable to rely upon a vague promise.  *Id*.  "These factors are strictly enforced to guard against the 'loose application' of promissory estoppel."  *Peluso*, 970 A.2d at 533 (quoting *Fried*, 196 A. at 43).  "The change in the plaintiff's position must be substantial, and there is 'no injustice in being deprived of a gratuitous benefit.'"  *Id*.  (quoting *Stelmack v. Glen Alden Coal Co*., 14 A.2d 127, 130 (Pa. 1940)).

### D.    Lack of Personal Jurisdiction – Review of Applicable Law

When reviewing a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), this Court must accept the plaintiff's allegations as true and resolve disputed facts in favor of the plaintiff. *Pinker v. Rocher Holdings Ltd*., 292 F.3d 361, 368 (3d Cir. 2002). However, once a defendant has raised a jurisdictional defense, the plaintiff must "prove by affidavits or other competent evidence that jurisdiction is proper." *See Metcalfe v. Renaissance Marine, Inc*., 566 F.3d 324, 330 (3d Cir. 2009) (quoting *Dayhoff Inc. v. H.J. Heinz Co*., 86 F.3d 1287, 1302 (3d Cir.1996)).  If an evidentiary hearing is not held, a plaintiff "need only establish a prima facie case of personal jurisdiction." *Id*. A plaintiff meets this burden by "establishing with reasonable particularity sufficient contacts between the defendant and the forum state." *Provident Nat. Bank v. California Fed. Sav. & Loan Assoc*., 819 F.2d 434 (3d. Cir 1987).

### E.      ERISA Preemption – Review of Applicable Law

The Employee Retirement Income Security Act of 1974 ("ERISA") sets forth uniform standards for employee benefit plans.  *See* 29 U.S.C. § 1001 *et seq*.  "To provide a uniform enforcement mechanism for these rules and requirements," Congress provided two preemptive statutory provisions.  *Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*, 967 F.3d 218, 226 (3d Cir. 2020).  These are "(1) 'complete preemption' under section 502(a); and (2) 'express preemption' under section 514(a).'"  *Roma Concrete Corp. v. Pension Assocs.*, 384 F. Supp. 3d 507, 514 (E.D. Pa. 2019) (quoting *Tenet Health Sys. Phila., Inc. v. Diversified Admin. Corp.*, No. 07-4948, 2012 WL 1548931, at *3 n.3 (E.D. Pa. May 2, 2012)).

Since ERISA preemption is an affirmative defense, Defendants bear the burden of proving its applicability.  *See Aetna Life Ins. Co. v. Huntingdon Valley Surgery Ctr.*, No. CIV.A. 13-03101, 2015 WL 1954287 at *4 (E.D. Pa. Apr. 30, 2015); *see also Brown v. Paul Revere Life Ins. Co.*, No. CIV.A. 01-1931, 2002 WL 1019021 at *5 (E.D. Pa. May 20, 2002).  "The law in this Circuit has long been that a district court may grant a Rule 12(b)(6) motion on the basis of an affirmative defense 'if the predicate establishing the defense is apparent from the *face of the complaint*.'"  *Brody v. Hankin*, 145 F. App'x 768, 771 (3d Cir. 2005) (quoting *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 n. 10 (3d Cir.1978) (emphasis in original)).

## IV.    ANALYSIS

The Court finds the following order of analysis most appropriate.  First, the Court will determine if Quick Health has sufficiently stated a claim for the relevant causes of action.  If it has, the Court will next address whether the Court has personal jurisdiction over DMP as to those claims.  Finally, if the Court has personal jurisdiction or finds jurisdictional discovery

appropriate, the Court will address whether Defendants have stated a viable affirmative defense to those claims.

### A.    Motion to Dismiss Counts I-IV

#### 1.    Count I: Breach of Implied Contract[2]

The Court begins with the averments of the SAC.  There, Quick Health generally claims that the parties undertook to collectively market and sell benefit plans to the public.  Further, the Defendants breached that contract "by failing to properly undertake their responsibilities pursuant to the business relationship [and] by publishing knowingly false and/or malicious statements regarding Plaintiff's business conduct."[3]  SAC ¶ 48.  Quick Health's brief shapes the theory further.  There, Quick Health puts forward a sort of division of labor contract wherein Defendants were responsible for accepting and recording the receipt of premiums, fielding complaints and claims, and honoring negotiated rates and policy terms.  For its part, Quick Health would market and sell the plans in exchange for a commission.

Defendants move to dismiss, proffering two arguments.  The first is that Quick Health's averments are too vague to identify any essential terms.  The Court disagrees.  Read in the context of the entire SAC, it may be inferred from the pleadings that the parties entered into an agreement.  The parties acted to get the Providence Plans to market.  Quick Health would sell and market the products, HMA would handle the claims, and Suffolk would administer the plan.

---

[2]    Defendants correctly note that this Court's prior order granted Quick Health leave to amend the complaint "as to any claims dismissed without prejudice."  *See* ECF No. 39.  Notwithstanding, Quick Health has added an entirely new cause of action in breach of an implied contract.  Nevertheless, the Court will consider the amendment given the Federal Rules of Civil Procedure's liberal approach to amending pleadings.  *See Abrams v. eResearch Tech., Inc.*, No. 2:23-CV-01881-JDW, 2023 WL 8237254 (E.D. Pa. Nov. 28, 2023).

[3]    The court dismisses the latter out of hand.  Those statements are the basis of Quick Health's defamation and commercial disparagement claims addressed below.

When Quick Health sold a plan, it was due a commission.  For illustrative purposes only, the Court reasons that in the absence of an express contract, Quick Health may have grounds to assert breach of implied contract if Defendants withheld that commission.  However that is not the agreement Quick Health is trying to recover on. This problem dovetails into Defendants' second argument.

Defendants next argue, and this Court agrees, that the actual agreement Quick Health's claims are based upon are the plan documents.  This raises a number of questions.  First, if Quick Health is suing Defendants for their failure to properly administer the plans, are those plans not the subject of a written contract?  The fact that Quick Health collects enrollment data from the customers would suggest that it is.  Again, Quick Health appears to try and recover on the breach of plans to which it is not a party nor third party beneficiary. By way of example, Quick Health complains of the following:

> Also on December 20, 2022, Quick Health learned member J.A. was informed by HMA that **he has a "mini" plan which will never cover wellness/prevention and that lab work was not covered under the plan**, despite being enrolled in an Advantage Core Plan, which provided such coverages.

SAC ¶ 32(d) (emphasis in original); *see also id.* ¶ 32(e) (complaining that M.F. "was not given the negotiated rate nor the supplemental benefit for a hospital stay while giving birth . . . despite being enrolled in an Advantage Core Plan."); *Id.* ¶ 32(f) (complaining that D.D.'s wellness, preventative appointment and colonoscopy were not covered despite having a "Bronze MVP plan.").  Indeed, Quick Health goes out of its way to disclaim any involvement in the post-sale administration of the plans.  The Court thus returns to the central flaw in Quick Health's claim; it is not a beneficiary to these plans and so there is no breach of a duty owed to Quick Health. While it may be well intentioned, Quick Health cannot "bring[] this action to protect the public." SAC ¶ 2.

Because Quick Health has already amended its complaint twice, the Court finds that granting leave to amend once more is inequitable.  Accordingly, the Court dismisses Count I with prejudice. [4]

2.      Count II: Promissory Estoppel

In the alternative, Quick Health asserts a claim for promissory estoppel.  In its previous Opinion, the Court dismissed Quick Health's claim for promissory estoppel because the representations were too vague to induce reliance.  The essential concern was that the promises were "not definite enough to determine the existence of a broken promise."  *Seguro Medico, LLC v. Suffolk Admin. Servs., LLC*, No. 5:23-CV-2495, 2023 WL 7324081, at *5 (E.D. Pa. Nov. 7, 2023).  For example, the "promise to interact honestly, properly, or in good faith" was an impermissibly "broad canvas to which Quick Health may pin any number of specific complaints as they materialize later in their business dealings." *Id*.  That reasoning still holds.  And so, the essential question here is whether Quick Health's SAC is any more specific.

Where Quick Health has failed to amend the pleading in any meaningful or substantive way, the Court will incorporate its prior reasoning and dismiss the claim once more.  Consider the following chart comparing the prior bases for promissory estoppel (all of which were dismissed) with Quick Health's SAC.  In bold are the changes made.

| Old | New |
|---|---|
| a. Properly handle and account for premiums collected from customers; | a. **Conduct business activities and transactions with Plaintiff in order to** properly handle and account for premiums collected from customers, **including regular accounting to Plaintiff**; |
| b. Actually provide the coverages described in the sales materials provided to | b. Actually provide the coverages described in the sales materials provided to |

---

[4]      *See Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004) (holding that "if a complaint is vulnerable to 12(b)(6) dismissal, a District Court must permit a curative amendment, unless an amendment would be inequitable or futile")

| | |
|---|---|
| Quick Health for use in selling the Providence products to the public; | **members of the public, which coverage descriptions were provided to Quick Health by Defendants and utilized by Quick Health in selling such insurance coverages, copies of which are collectively attached hereto as Exhibits "B" through "H";** |
| c. Accurately and honestly convey to consumers the coverages available in the Providence plans that they purchased; | c. Accurately and honestly convey to **customers** the coverages available in the plans that the **customers** purchased; |
| d. Offer customers reference based pricing for health care services listed in the Providence plans; | d. Offer customers reference-based pricing for healthcare services listed in the **descriptions of the plans**; |
| e. Advise customers of network negotiate rates available through the Providence network; | e. **Defendants would** advise customers of network negotiated rates available through the Providence network; |
| f. Interact honestly with customers regarding the role of Quick Health as a customer enrollment center and not mischaracterize Quick Health as a claims adjuster or as having responsibility to pay claims; and | f. Interact **truthfully** with customers regarding the role of Quick Health as a customer enrollment center and not mischaracterize Quick Health as a claims adjuster or otherwise bearing responsibility to pay claims. |
| g. Deal with Quick Health in good faith. | [omitted] |

*See* ECF Nos. 15, 40 (emphasis added).  The Court holds that the SAC fares no better as to promises 'c' through 'f.'  Those averments make no substantive changes so as to cure the Court's vagueness concerns.  For example, changing "consumers" to "customers" and changing "honestly" to "truthfully" simply swamps synonyms and is thus still insufficient to support a claim for detrimental reliance.

Averments 'a' and 'b,' however, have been substantively changed.  'a' now avers that Defendants promised to provide regular accounting to Quick Health.  This is sufficient to state a claim for promissory estoppel.  The theory is that Defendants represented that they would provide a "regular accounting" to Quick Health.  It is an action for which Quick Health received

the benefit and is definite enough to discern whether the promise was breached.  That accounting would presumably show Quick Health that the premiums were being properly collected and transferred.  And Quick Health relied on this fail safe in growing its infrastructure to sell the plans.

Promise 'b,' however, once again fails to pass muster for two interrelated reasons.  The promise now incorporates by reference the coverage descriptions attached to the SAC as Exhibits B through H.  The first problem is that breaking a promise to "[a]ctually provide the coverage described" in these materials supposes that members of the public did in fact purchase these plans and are subject to those plan's written terms.  That would give the purchasing members of the public the right to recover on that breach but for Quick Health to recover, it would have to be a beneficiary of the plan.  Again, there is nothing to suggest it is.

Second, but relatedly, promissory estoppel does not protect third party reliance in this instance.  Quick Health correctly notes that the Restatement permits third party reliance.  It also addresses non-beneficiary third-parties, stating that "[j]ustifiable reliance by third persons who are not beneficiaries is less likely, but may sometimes reinforce the claim of the promisee or beneficiary."  Restatement (Second) of Contracts § 90 cmt c. (1981).  Quick Health offers just a lone application of this sort of third party theory of promissory estoppel in a 1930 California Supreme Court case.  *See Burgess v. California Mut. Bldg. & Loan Ass'n*, 290 P. 1029 (Cal. 1930).  While the Restatement has been adopted by Pennsylvania courts, Quick Health cites no Pennsylvania caselaw applying promissory estoppel to non-beneficiary third-parties.  That is almost certainly because promissory estoppel, at its essence, is premised upon contract principles.  And to impose liability for failed business expectations in transactions the claimant is not a party to, is to create a vehicle of near limitless liability.

Accordingly, given Pennsylvania law's general caution against the expansive nature of promissory estoppel, the Court ventures an *Erie*-prediction that the Pennsylvania Supreme Court would not recognize justifiable reliance by a non-beneficiary third party in this context. *See Peluso*, 970 A.2d at 533 (reasoning that the elements of promissory estoppel must be "strictly enforced" to guard against "loose application.")

In sum, to the extent Quick Health premises its promissory estoppel claim on the representation that Defendants promised to provide an accounting to Quick Health, the claim survives. In all other respects, Quick Health has not pled a viable claim for promissory estoppel.

        3.        Count IV: Defamation

Suffolk moves to dismiss the defamation and commercial disparagement claims brought in the SAC. While this Court denied Suffolk's previous motion to do so, Quick Health has substantively changed the averments of this cause of action (notwithstanding the Court's Order limiting amendments to the claims dismissed without prejudice). Thus, the Court finds it appropriate to revisit the sufficiency of Counts III and IV.

As it relates to defamation, Suffolk points out that the SAC has been amended in one key regard. Now, Quick Health avers that *only* HMA told "customers that Quick Health was a scam" whereas the prior Amended Complaint attributed this statement to both Suffolk and HMA.[5] *See* Am. Compl. ECF No. 15, ¶¶ 36, 48, 54. Suffolk argues that this change renders the defamation claim against Suffolk insufficient because Suffolk's remaining statements are not capable of a defamatory meaning. This is a threshold question for the Court. *Balletta v. Spadoni*, 47 A.3d

---

[5]      In fact, Quick Health increased its allegations about HMA's statements, averring that "HMA was informing customers that Quick Health was a scam, filed bankruptcy every two years, sold junk plans and were taking customer's money and not giving them a plan." SAC ¶ 30.

183, 197 (Pa. Commw. 2012) ("Whether a communication is capable of a defamatory meaning is a question for the court in the first instance.")  In its prior opinion, the Court found the statements "capable of a defamatory meaning as they impute[d] criminal business misconduct."  *Seguro Medico*, 2023 WL 7324081, at *8.  Specifically, accusations of 'scamming' imputed fraudulent or deceptive conduct.  *Id*.

However, the SAC is now more specific and Quick Health no longer alleges that Suffolk made those statements, only HMA.[6]  Without that, the defamation claim loses the sort of "corporat[e] fraud, deceit, dishonesty, or reprehensible conduct" that comprises these claims.[7]  *P&I Ins. Servs., LLC v. Risk Averse Ins., LLC*, No. CV 20-5910, 2022 WL 103135 (E.D. Pa. Jan. 11, 2022) (quoting *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 924 (3d Cir. 1990).  Quick Health still avers that Suffolk falsely told customers that Quick Health was responsible denying claims.  However, those statements cast doubt on the quality of Quick Health's services and its capacity to deliver the goods it sold.  That is a theory is better suited for commercial disparagement.

---

[6]   Quick Health seemingly walks back these changes in its brief by regrouping HMA and Suffolk together as "Defendants" throughout Section IV(b)(iii)(1)-(2).  However, this does not change the averments of the SAC.

[7]   Quick Health also puts forward an unclear "defamation by innuendo" claim in its brief, arguing that Defendants' statement that Quick Health was at fault for denying the claims "bear[s] an innuendo that . . . will lead to a reasonable inference that even the statements by Defendants that were factually true were nonetheless defamatory."  ECF No. 47, Resp. at 20.  While the Court does not understand the argument Quick Health puts forward, it is evident there is no indication of fraud or reprehensible conduct.

Accordingly, Count IV is dismissed as it relates to Suffolk.  Again, because Quick Health has twice amended its Complaint, the Court finds it appropriate to dismiss the claim with prejudice.[8]

4.       Count III: Commercial Disparagement

The statements attributed to Suffolk still constitute a sufficient claim for commercial disparagement.  Read in the context of the entire complaint, Quick Health avers that numerous customers began complaining to the plan administrators (Suffolk and HMA) about wholesale lapses in coverage and the denial of benefits.  In response, both Suffolk and HMA falsely claimed that Quick Health was responsible for these failures. Suffolk and HMA knew these claims to be false because it was in fact their responsibility to administer the claims and determine benefit coverage.  At the very least, they were aware that Quick Health's responsibility ended upon passing the enrollment data and payment information to the Payment TPA.  This 'passing of the buck' had the natural effect of customers cancelling the coverage bought from Quick Health because they were led to believe that coverage was illusory.

Further, Quick Health has plead actual pecuniary loss in the form of 6,200 customers cancelling their coverage, costing Quick Health $9.8 million in lost profits from the sale of these plans.  *See Brooks Power Sys., Inc. v. Ziff Commc'ns, Inc.,* No. CIV.A. 93-3954, 1994 WL 444725 at *3 (E.D. Pa. Aug. 17, 1994) (noting that a plaintiff "may prove pecuniary loss through a general diminution in sales of the product actually caused by its disparagement.") At this juncture, this is sufficient to state a claim for commercial disparagement. *Cf. Mallory v. S & S Publishers*, 168 F. Supp. 3d 760, 775 (E.D. Pa. Mar. 10, 2016) (holding that mere threadbare

---

[8]       *See Alston,* 363 F.3d at 235 (holding that "if a complaint is vulnerable to 12(b)(6) dismissal, a District Court must permit a curative amendment, unless an amendment would be inequitable or futile").

allegations of "financial loss and lost opportunity" were conclusory and insufficient to state a

cause of action sounding in commercial disparagement.); *Brunson Commc'ns, Inc. v. Arbitron,*

*Inc.*, 266 F. Supp. 2d 377, 381-83 (E.D. Pa. June 10, 2003) (dismissing commercial

disparagement claim where the plaintiff failed to "plead any specific amount or type of damages

actually caused by this alleged disparagement.")

Accordingly, Suffolk's Motion to Dismiss Count III is denied.

**B.      Personal Jurisdiction over DMP**

DMP argues that the Court lacks jurisdiction over the entity as it is not incorporated in

Pennsylvania, conducts no business here, and has no relationship to the Providence Plans.  In

support, DMP attached a declaration of Steven Lazarou, the current representative of DMP,

stating as much.  *See* ECF No. 44, Mot., Ex. A.  For its part, Quick Health argues that this Court

has both general and specific jurisdiction over DMP by way of its agent HMA's conduct in

Pennsylvania.  In the alternative, Quick Health requests leave to conduct jurisdictional discovery.

The Court addresses each in turn.

1.      General Jurisdiction

Quick Health's general jurisdiction theory has two layers.  First, it argues that *Mallory v.*

*Norfolk Southern Railway* provides for the exercise of general jurisdiction over a corporation

which consents to suit in Pennsylvania as a precondition of registering to do business here.  *See*

*Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122 (2023) (plurality opinion).  While that is generally

correct, *Mallory* does not apply because Quick Health does not allege that DMP is registered to

do business in the Commonwealth.  Rather, it argues that HMA is registered in Pennsylvania,

and that as DMP's agent, HMA's registration subjects DMP to general jurisdiction in

Pennsylvania.

However, "the mere fact that a principal-agent relationship exists does not confer personal jurisdiction over a nonresident principal." *Rychel v. Yates*, No. CIV.A. 09-1514, 2011 WL 1363751, at *11 (W.D. Pa. Apr. 11, 2011). The Court must still engage in a constitutional inquiry as to whether DMP may be properly haled into the forum.[9] *Id.* Quick Health's argument offers no facts to this effect, it merely seeks to latch DMP onto HMA's jurisdictional factors.

Its reliance on *D'Jamoos* is also unavailing. *D'Jamoos* applies Colorado and Tenth Circuit law. *See D'Jamoos ex rel. Est. of Weingeroff v. Pilatus Aircraft Ltd*., 566 F.3d 94, 108-109 (3d Cir. 2009). Further, the prima facie showing of general jurisdiction in *D'Jamoos* did not rest on a simple principal-agent relationship but rather concerned a wholly owned subsidiary established by the parent for the purpose of completing, marketing, selling and servicing the parent company's aircraft in the United States. *Id.* at 109. In other words, the Court focused on the contacts that relationship produced, rather than the mere fact of a relationship. *See also Riad v. Porsche Cars N. Am., Inc*., 657 F. Supp. 3d 695, 705 (E.D. Pa. 2023) (rejecting an agency theory of general jurisdiction premised solely on a foreign corporation's in-state subsidiary.)

Accordingly, the Court holds that Quick Health has failed to put forward a prima facie case of this Court's general jurisdiction over DMP.

2.     Specific Jurisdiction

Quick Health's theory of specific jurisdiction is similarly premised on an agency theory and argues that HMA, and by extension DMP, is subject to specific jurisdiction under the *Calder*

---

[9]     Indeed, the plurality's reasoning rested on notions of consent. *See Mallory*, 600 U.S. at 137-140. Quick Health does not aver that DMP consented to jurisdiction by registering to do business in Pennsylvania. Without consent, Quick Health cannot rest on *Mallory* but must instead pursue an alternative road to jurisdiction over the out of state entity. *Id*. at 138.

effects test.[10]   However, *Calder* applies to intentional torts and Quick Health does not assert any intentional torts against DMP.  Quick Health's two claims against DMP are breach of implied contract (which plainly arises under contract law and is now dismissed) and promissory estoppel, which sounds in contract law.  *See Crouse v. Cyclops Indus.*, 745 A.2d 606, 610 (Pa. 2000) ("[A]s promissory estoppel makes otherwise unenforceable agreements binding, the doctrine sounds in contract law.")  Thus, the *Calder* effects test has no bearing.  *See also Lutz v. Rakuten, Inc.*, 376 F. Supp. 3d 455, 466 n.5 (E.D. Pa. 2019) (finding that the *Calder* effects test is inapplicable to promissory estoppel because the action does not sound in tort law.).

Instead, the Court looks to *Burger King v. Rudzewicz* and related cases.  *See Walsh v. Alarm Sec. Grp., Inc.*, 157 F. Supp. 2d 501 (E.D. Pa. 2001) (analyzing personal jurisdiction over a promissory estoppel claim through a contract lens.)  "The mere existence of a contract is insufficient to establish minimum contacts." *Budget Blinds, Inc. v. White*, 536 F.3d 244, 261 (3d Cir. 2008).  While a contract is certainly relevant, other factors such as "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" are relevant to "whether the defendant purposefully established minimum contacts within the forum." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985).

Since DMP has challenged personal jurisdiction and produced a declaration denying that it has conducted any business in Pennsylvania, Quick Health bears the burden of demonstrating a

---

[10]     Courts apply the *Calder* effects test when intentional torts are involved. *See Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 108 (3d Cir. 2004) (concurring opinion). Under the *Calder* effects test, the court may exercise jurisdiction over a nonresident defendant when:
> (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; and (3) the defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.

*Marten v. Goodwin*, 499 F. 3d 290, 297 (3d Cir. 2007).

prima facie case in favor of personal jurisdiction supported "by affidavits or other competent evidence." *Metcalfe*, 566 F.3d at 330 (quoting *Dayhoff*, 86 F.3d at 1302). This analysis is hampered by the lack of specificity in Quick Health's SAC. Quick Health avers that Defendants, including DMP, promised to provide it a continuous accounting of the healthcare premiums. This is not a random or attenuated contact with Pennsylvania but rather a purposeful contact which contemplated an ongoing duty to the Pennsylvania company. However, rather than relying on this contact, Quick Health's brief premises its theory of jurisdiction solely on the actions of its purported agent and an erroneous legal standard. Thus, Quick Health has not established a prima facie case of personal jurisdiction.

3.     Jurisdictional Discovery

That is not to say it cannot and so the Court grants Quick Health the opportunity to conduct jurisdictional discovery. The Court does so heeding the notion that "[i]f a plaintiff presents factual allegations that suggest 'with reasonable particularity' the possible existence of the requisite 'contacts between [the party] and the forum state,' the plaintiff's right to conduct jurisdictional discovery should be sustained." *Toys "R" Us v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003) (quoting *Mellong Bank (East) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992)). Courts should grant jurisdictional discovery unless the plaintiff's claim is "clearly frivolous." *Id.*

Quick Health's claim here is not frivolous. There appears to be a factual dispute as to what representations DMP made to Quick Health and whether DMP is the sponsor of the underlying plans. Quick Health should have the opportunity to develop these facts through limited jurisdictional discovery. Accordingly, DMP's motion to dismiss for lack of jurisdiction is denied without prejudice to DMP's right to renew it at the close of jurisdictional discovery.

C.       ERISA Preemption

Finally, Defendants argue that Counts I and II are preempted by ERISA.  Since ERISA

preemption is an affirmative defense, Defendants bear the burden of establishing it.  *Aetna Life*

*Ins. Co*, 2015 WL 1954287 at *4.  The problem with Defendants' argument is that it presupposes

that the underlying plans are indeed ERISA Plans.  That remains an open question.  As Quick

Health argues, "[i]f it is not, the entire ERISA preemption argument DMP is currently making is

a nullity."  *See* Resp. at 9.  As a general matter, ERISA is "predicated on the employment

relationship." ERISA Practice and Litigation § 2:12. But the parties here dispute whether one

even exists.  Defendants simply invoke ERISA by citing Quick Health's use of the words "plan

sponsor" and "administrator" while describing the scheme in the SAC.

Defendants also direct the Court's attention to a District of North Texas decision finding

that the plan is indeed governed by ERISA.  *See Data Mktg. P'ship, LP v. United States Dep't of*

*Lab.*, 490 F. Supp. 3d 1048, 1068 (N.D. Tex. 2020).  The Fifth Circuit reversed the matter, in

part, on appeal and remanded that case back to the District Court to consider whether the limited

partners are working owners or bona-fide partners within the meaning of ERISA.  *Data Mktg.*

*P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846 (5th Cir. 2022).  Those are open questions

here too.  These are fact intensive inquiries made more complicated by DMP's unique business

model.  With regard to construing the term "working owner," as the Fifth Circuit indicated:

> *Yates* requires courts to determine whether ERISA's text provides "specific
> guidance" on the precise question before the court, such that resort to the common
> law is unnecessary. To determine whether ERISA provides "adequate[ ]
> informati[on]," courts must consider, among other things, all four titles of ERISA
> and the Internal Revenue Code.

*Id.* at 858.  With regard to bona-fide partners, the relevant regulation states:

> *Employment relationship*. In the case of a group health plan, the term employer also
> includes the partnership in relation to any bona fide partner. In addition, the term

employee also includes any bona fide partner. Whether or not an individual is a bona fide partner is determined based on all the relevant facts and circumstances, including whether the individual performs services on behalf of the partnership.

29 C.F.R. § 2590.732(d)(2). All this to say, "[w]hether a plan exists within the meaning of ERISA is 'a question of fact, to be answered in light of all the surrounding facts and circumstances from the point of view of a reasonable person.'" *Deibler v. United Food & Com. Workers' Loc. Union 23*, 973 F.2d 206, 209 (3d Cir. 1992) (quoting *Wickman v. Northwestern National Ins. Co.*, 908 F.2d 1077, 1082 (1st Cir.1990)). Here, the Court is without the "relevant facts and circumstances" necessary to make this assessment. The Court finds that Defendants have not shown, from the face of the complaint, that the underlying plan is indeed an ERISA plan, much less preempted by the Act. Accordingly, the Court holds that ERISA preemption is premature. *See Deblasio v. Cent. Metals, Inc.*, No. 1:13-CV-5282 NLH/AMD, 2014 WL 2919557 at * 7-8 (D.N.J. June 27, 2014) (declining to dismiss state law claims on the basis of ERISA preemption where the Court could not "determine based on the Complaint alone whether the Policy constitutes an ERISA plan.").

## V.     CONCLUSION

Since Quick Health's breach of implied contract theory does not rest on any duty owed to Quick Health, the Court dismisses Count I with prejudice. Since Defendants' promise to provide regular accounting to Quick Health is definite enough to discern whether the promise was breached and because Quick Health relied upon it to its detriment, the Court declines to dismiss Count II. In all other respects, however, Quick Health's claim for promissory estoppel is insufficient. Further, because the statements attributed to Suffolk are not capable of a defamatory meaning, Count IV is dismissed with prejudice as to Suffolk. Notwithstanding, the

Court overrules the Motion to Dismiss Count III because the statements attributed to HMA and Suffolk are sufficient to state a claim for commercial disparagement.

Quick Health's theory of specific jurisdiction over DMP is not frivolous and so this Court will permit Quick Health to conduct limited jurisdictional discovery regarding DMP's jurisdictional contacts.  Finally, because it is not apparent from the face of the SAC that the underlying plans are ERISA plans, preemption is premature.

A separate Order follows.

BY THE COURT:

_/s/ Joseph F. Leeson, Jr._____
JOSEPH F. LEESON, JR.
United States District Judge